# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                      Plaintiff,<br><br>v.<br><br>EDGAR RENE REVOLORIO-TAMBITO,<br><br>                      Defendant. | Case No.: 19-mj-10657-JLB-1<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**<br><br>**[ECF No. 9]** |

Defendant is charged by complaint with violating 8 U.S.C. § 1325(a)(1) which provides, in relevant part, that "[a]ny alien who (1) enters or attempts to enter the United States at any time or place other than as designated by immigration officers . . . shall [be guilty of a misdemeanor]." (*See* ECF No. 1.) Defendant moves to dismiss the complaint on six grounds: (1) Congress violated the non-delegation doctrine when it enacted the statute; (2) Section 1325(a)(1) is impermissibly vague in violation of the Due Process Clause; (3) the Complaint fails to allege the required elements of § 1325(a)(1); (4) Section 1325's definition of "alien" violates the Equal Protection and Due Process Clauses; (5) the "streamline" prosecution violates equal protection, selective enforcement/prosecution and due process; and (6) the prosecution of asylum seekers violates the Fifth Amendment and statutory and treaty obligations. (ECF No. 9.) The United States opposes. (ECF No. 10.)

### I. Non-Delegation Doctrine

Article 1, Section 1 of the United States Constitution provides that "all legislative powers herein granted shall be vested in a Congress of the United States." The non-delegation doctrine generally forbids Congress from delegating to another branch of government "powers which are strictly and exclusively legislative." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825)). But the Constitution does not "deny[] to the Congress the necessary resources of flexibility and practicality [that enable it] to perform its function[s]." *Id.* (alterations in original) (quoting *Yakus v. United States*, 321 U.S. 414, 425 (1944)). Congress's authority to confer substantial discretion on executive agencies to implement and enforce the laws is well established. *Mistretta v. United States*, 488 U.S. 361, 373–74 (1989) (collecting cases where delegation was upheld and noting the Supreme Court has struck down only two statutes for impermissible delegation and both occurred in 1935).

Congress generally cannot delegate away the inherently legislative task of determining what conduct should be punished as a crime. *United States v. Kozminski*, 487 U.S. 931, 949 (1988). The Supreme Court has held time and again, however, that "Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Gundy*, 139 S. Ct. at 2123. Congress can, therefore, permit an executive-branch official to fill in the details of a legislative scheme as long as Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform." *Id.* at 2138–39 (alteration in original) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

Defendant argues that § 1325(a) violates the nondelegation doctrine because it permits executive-branch officials the discretion to determine what constitutes a crime under § 1325(a). Defendant interprets the statute to permit any "immigration officer[]" to designate the times and locations where entry into the United States is lawful. (ECF No. 9-1 at 3.) Defendant argues that this delegation is improper because Congress failed to provide any "intelligible principle" to guide and constrain that exercise of discretion. (*Id.*

at 3–9.) The Government opposes arguing that Defendant's reading of the doctrine is far too broad because Congress was not required to "spell out" for the executive agency how to determine where and when ports of entry are open. (ECF No. 10 at 3.)

The Court agrees with the Government's position. Defendant appears to conflate Congress's purpose in creating § 1325(a) and the practical details of its implementation. Congress determined that there should be a proper location and procedure for an alien to seek admission to the United States. *See* 8 U.S.C. § 1225(a)(3) (requiring all applicants for admission to be inspected by immigration officers). Congress also established penalties for failing to follow those procedures. *See* 8 U.S.C. §§ 1321–1330. Section 1325(a) is one such provision. The details of where and when the ports of entry would be located was left to the executive agency responsible for staffing the facilities.

Defendant attempts to read into the statute a broader delegation than actually occurred by arguing that any individual immigration official can designate any piece of land as a place for entry. Not so. Congress requires that aliens seeking lawful entrance to the United States do so at a port of entry. *See United States v. Corrales-Vasquez*, 931 F.3d 944, 946 (9th Cir. 2019); *United States v. Aldana*, 878 F.3d 877, 882 (9th Cir. 2017). Ports of entry can only be designated or de-designated by the Secretary of Homeland Security subject to the Administrative Procedures Act. *See* 8 C.F.R. § 100.4(a). Ports of entry also necessarily include facilities, staffed by immigration officials that are set up to accept applications for admission. *Aldana*, 878 F.3d at 882. To interpret § 1325(a) to permit a border patrol agent to designate a portion of the border fence "on a whim" is in direct conflict with Congress's clear statutory scheme.

In support of his argument, Defendant cites to the Supreme Court's decision in *Touby v. United States*, 500 U.S. 160 (1991). At issue there was a statute that allowed the Attorney General to temporarily designate a substance as a Schedule 1 Controlled Substance, thereby making possession of that substance illegal. *Id.* at 165. The Supreme Court in *Touby* held that the delegation was permissible, however, because Congress provided the Attorney General factors to consider before designating a new substance.

3

Defendant argues the delegation at issue in § 1325(a) is similar, but Congress provided no guidance as to where ports of entry should be open and their hours of operation.

The Court disagrees that the issue in *Touby* is similar to § 1325(a). In *Touby*, the Attorney General had the authority to make the legal possession of a substance illegal. This is a discretionary act that expands the scope of criminal conduct under the statute. Legislative guidance was required. The practical issues of where and when ports of entry are open does not alter the scope of conduct considered criminal under § 1325(a). The type of conduct prohibited remains the same regardless of what physical piece of ground a port of entry is on. Setting the location of ports of entry and hours of operation only affects when and where an alien may lawfully comply with Congress's directives. It does not change the scope of conduct that would subject an alien to criminal liability.

The Government cites to the most recent Supreme Court case dealing with the nondelegation doctrine to offer support for its position. In *Gundy v. United States*, the Court upheld a delegation to the Attorney General to determine when it would be feasible to require sex offenders convicted prior to the statute's enactment to register. 139 S. Ct. 2116, 2121 (2019). In an analogous delegation to this one, Congress determined that the registration requirements applied to pre-Act offenders but left the practical problems of implementation and when pre-Act offenders would be required to register to the Attorney General.

The Court finds the type of delegation under § 1325(a) to be analogous to the delegation in *Gundy*. Congress determined that entering the United States outside a port of entry was prohibited and properly and practically delegated authority to implement Section 1325(a) to the Executive Branch, the agency that would be responsible for staffing and operating the ports of entry. The Court therefore concludes that the statute challenged by Defendant does not violate the nondelegation doctrine.

Accordingly, Defendant's Motion to Dismiss on this basis is **DENIED**.

///

///

## II. **Void for Vagueness**

Defendant next argues that the Complaint must be dismissed because § 1325(a)(1) is impermissibly vague in violation of the Due Process Clause. Defendant's argument is essentially the same as the argument discussed above. Specifically, Defendant contends § 1325(a)(1) runs afoul of the Constitution because it allows "immigration officers" to decide on a "whim" what places and times to designate for entry. This, Defendant argues, at least permits arbitrary enforcement and subjects the statute to a facial attack. (ECF No. 9-1 at 9–10.)

A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Second, if it authorizes or even encourages arbitrary and discriminatory enforcement. *Id.* But if "it is clear what the ordinance as a whole prohibits," *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972), speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid "in the vast majority of its intended applications." *Hill*, 530 U.S. at 733 (quoting *United States v. Raines*, 362 U.S. 17, 23 (1960)).

As the Government points out, Defendant is charged with "attempting" to enter the United States at a location other than as designated. (ECF No. 10 at 4.) Consequently, the Government argues that how the area was designated is irrelevant to this prosecution. The Court agrees. Furthermore, it is well settled that speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid "in the vast majority of its intended applications." *Hill*, 530 U.S. at 733 (quoting *Raines*, 362 U.S. at 23).

Defendant's argument that the statute is impermissibly vague because any "immigration officer" can designate any piece of land to be a port of entry is inconsistent with the overall statutory scheme. Reading § 1325(a) in a vacuum may lead one to that conclusion. But it is a basic canon of statutory interpretation that a statute must be read in

5

its context and with a view to its place in the overall statutory scheme. *Corrales-Vazquez*, 931 F.3d at 949. Ports of entry are identified by federal regulation. *See* 8 C.F.R. §§ 100.4(a), 235.1. Ports of entry necessarily require facilities where immigration officers can accept applications for admission from aliens. *See Aldana*, 878 F.3d at 882. Moreover, the process to designate a port of entry requires formal action by the Secretary of Homeland Security. *See, e.g.*, Opening of Boquillas Border Crossing and Update to the Class B Port of Entry, 77 Fed. Reg. 76346-01 (Dec. 28, 2012) (to be codified at 8 C.F.R. pt. 100, 19 C.F.R. pt. 101) (providing notice of a proposed rule to create a border crossing in Big Bend National Park).

Given the formal procedures required to designate and de-designate a port of entry, and Congress's determination that a port of entry is the only place an alien may lawfully seek admission, the Court finds that § 1325(a)(1) is surely valid in the vast majority, if not all, of its intended applications, and Defendant's hypothetical argument is insufficient to support a facial attack.

Accordingly, Defendant's Motion to Dismiss on this basis is **DENIED**.

### III. Elements of § 1325(a)(1)

Defendant argues the Complaint must be dismissed because it fails to allege the elements of § 1325(a)(1). (ECF No. 9-1 at 10–14.) Defendant specifically alleges that the Government failed to charge that Defendant knew he was an alien. (*Id.*)

Defendant argues that a recent Supreme Court decision requires the Complaint to be dismissed because the Government failed to allege that he "knew he was an alien" at the time of the alleged offense. *See generally Rehaif v. United States*, 139 S. Ct. 2191 (2019). *Rehaif* involved a prosecution under 18 U.S.C. § 922(g) for possession of a firearm by an "alien . . . unlawfully in the United States." *Id.* at 2194. The Supreme Court held that because only a "knowing violation" of the statute constituted a crime, the Government was required to prove both that the defendant knew he possessed a firearm and that he knew his own status. *Id.*

1       The Government disagrees arguing that *Rehaif* is inapplicable because it turned on the statutory construction of the firearms statute. The Government also argues that the underlying policy concerns at issue in *Rehaif* are markedly different from this case, further making *Rehaif* inapplicable. (ECF No. 10 at 6–8.)

**B.  Legal Standard**

      A charging document must include the "essential facts constituting the offense charged[.]" Fed. R. Crim. P. 7(c)(1). A charging document "that tracks the words of the statute violated is generally sufficient" to allege the elements of an offense, but "implied necessary elements, not present in the statutory language" must be included. *United States v. Jackson*, 72 F.3d 1370, 1380 (9th Cir. 1995).

      Whether a criminal statute that is silent as to *mens rea* requires the Government to prove that the defendant acted knowingly is a question of Congressional intent. *Rehaif*, 139 S. Ct. at 2195. To determine Congress's intent, courts begin with the "longstanding presumption, traceable to the common law, that Congress intends to require a defendant to possess a culpable mental state regarding 'each of the statutory elements that criminalize otherwise innocent conduct.'" *Id.* (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994)). The presumption applies even when Congress does not specify any scienter in the statutory text, but "applies with equal or greater force when Congress includes a general scienter provision in the statute itself." *Id.*

      *Rehaif*

      The defendant in *Rehaif* was charged with violating 18 U.S.C. § 922(g), which bars certain persons, including aliens who are "illegally or unlawfully in the United States," from possessing firearms. A separate provision of Title 18 provides that anyone who "knowingly violates" § 922(g) is subject to fine or imprisonment for up to 10 years. 18 U.S.C. § 924(a)(2).

      Read together, §§ 922(g) and 924(a)(2) explicitly provide that only a "knowing" violation of the statute will constitute a criminal act. The issue before the Supreme Court was therefore limited to the scope of that knowledge requirement. It was undisputed that

the Government must prove that the defendant knew he possessed a firearm. The Court limited its inquiry as to whether the Government must also prove that the defendant knew he was an alien "unlawfully in the United States." *Rehaif*, 139 S. Ct. at 2194.

The Supreme Court held that applying the express scienter requirement to the defendant's status was consistent with the statutory construction of §§ 922(g) and 924(a)(2). *Id.* The Court also found that application of the knowledge requirement to the defendant's status furthered the underlying goal of the Court to "help[] . . . separate wrongful from innocent acts." *Id.* at 2197.

The Court explained that, "[a]ssuming compliance with ordinary licensing requirements, the possession of a gun can be entirely innocent." *Id.* It was only the defendant's status as an "alien . . . unlawfully in the United States" that converted his conduct into a criminal act. *Id.* Specifically, the Court found that defendant's status was the "crucial element" that made his conduct unlawful. *Id.* The Court further noted that "[w]ithout knowledge of that status, the defendant may well lack the intent needed to make his behavior wrongful." *Id.*

## C. Analysis

### 1. Relevant Status

Defendant argues that "just as in *Rehaif*, [it is] 'the defendant's *status*, and not his conduct alone, that makes the difference' between criminal and non-criminal conduct." (ECF No. 9-1 at 14.) Defendant's argument fails to make an important distinction between the relevant status at issue in *Rehaif* and his own status. In *Rehaif*, the defendant's relevant status was that he was an alien "unlawfully in the United States." Here, at issue is Defendant's status as an "alien."

Contrary to Defendant's argument, Rehaif's violation of § 922(g) did not turn on his status as an alien. An "alien" is any person not a citizen or national of the United States. 8 U.S.C. § 1101(a)(3). Section 922(g) does not prohibit an alien who is lawfully present from possessing a firearm. 18 U.S.C. § 922(g)(5) ("It shall be unlawful for any person . . . who, being an alien, is illegally or unlawfully in the United States."). The Supreme

8

Court in *Rehaif* held that the Government must prove Rehaif knew he fell into the relevant status group that made his conduct unlawful. Knowing whether or not he was an alien would not have put Rehaif on notice that he was violating § 922(g). The outcome determinative factor was whether or not Rehaif knew he was "unlawfully in the United States."

Section 1325 does not require proof that Defendant was unlawfully in the United States. The Court further notes that Defendant is only charged with attempted unlawful entry. On that basis, the Court concludes that the rationale in *Rehaif* is not directly applicable to a prosecution under § 1325 and does not require the Government to allege or prove that Defendant knew he was an alien.

### 2. Defendant's Status is Not a Crucial Element that Makes His Conduct Unlawful

Defendant's argument that *Rehaif* applies to his case fails for a second, but related reason. In *Rehaif*, the Government argued that "Congress does not normally require defendants to know their own status." *Rehaif*, 139 S. Ct. at 2197. The Supreme Court in its decision expressly stated that they "need not decide whether [they] agree or disagree with the Government's interpretation" because in the provision at issue in *Rehaif*, the defendant's status was the "crucial element" separating innocent from wrongful conduct. *Id.*

The Supreme Court noted that in the statutes cited by the Government, "the conduct prohibited—misappropriating classified information, seeking to evade detection for certain federal crimes, and facilitating child pornography—would be wrongful irrespective of the defendant's status." *Id.* That difference "assure[d] [the Court] that the presumption in favor of scienter applie[d] . . . even assuming the Government is right that these other statutes do not require knowledge of status." *Id.*

Defendant argues that it is only his status as an alien that rendered his conduct unlawful. In support, Defendant cites to 19 U.S.C. § 1459 for his proposition that "a U.S. citizen who just enters or attempts to enter the United States at a non-designated time or

9

19-mj-10657-JLB-1

place has committed no offense." (ECF No. 9-1 at 14.) Specifically, he argues that under the statute a U.S. citizen can enter the United States at a non-designated time or place and will not have committed a crime unless he both intentionally fails to enter at a designated location and intentionally fails to immediately report his arrival. (*Id.*)

The Court disagrees in part with Defendant's analysis of 19 U.S.C. § 1459. Unlike in *Rehaif*, the Court finds that Defendant's conduct would be unlawful regardless of his status as an alien. In relevant part, § 1459(a) provides that:

(a) [I]ndividuals arriving in the United States other than by vessel, vehicle, or aircraft **shall**—

   (1) enter the United States only at a border crossing point designated by the Secretary; **and**

   (2) immediately—

      (A) report the arrival, and

      (B) present themselves . . . for inspection[.]

19 U.S.C. § 1459(a) (emphasis added). A plain reading of the text makes clear that the provision requires all individuals to: (1) enter the United States at a designated location; and (2) immediately report their arrival. Both are required. Therefore, contrary to Defendant's analysis, a U.S. Citizen who enters the United States at a non-designated location has violated this statute regardless of whether or not they report the arrival.

The Court agrees with Defendant to the extent that a U.S. citizen may not be subject to criminal penalties for simply entering at a non-designated location. Only an intentional violation of § 1459(a) may result in criminal penalties. *See* 19 U.S.C. § 1459(g). But the statute provides for both civil and criminal penalties. *See* 19 U.S.C. § 1459(f)–(g). Any individual, citizen or alien, who violates any provision of subsection (a) is subject at least to civil penalties.

In *Rehaif*, the Supreme Court concluded that but for the defendant's status, the possession of a firearm could have been "entirely innocent." 139 S. Ct. at 2197. The defendant's status was the "crucial element" that made his conduct unlawful. *Id.* Here,

1 however, Defendant's conduct would have violated the law regardless of his alienage. His
2 alleged conduct in attempting to enter the United States at a non-designated location was
3 not "entirely innocent." *See id.* On that basis, the Court further finds that the analysis in
4 *Rehaif* is not applicable.

### 3. Policy Considerations

The Supreme Court, in dicta, relied on several policy grounds to support its holding in *Rehaif*. The Court finds that those policy concerns are not present here and do not support applying *Rehaif* to this case.

*Rehaif* primarily turned on the statutory construction of §§ 922(g) and 924(a)(2). *See also United States v. Class*, 930 F.3d 460, 468 (D.C. Cir. 2019). As discussed above, § 924(a)(2) includes an express scienter requirement in the text of the statute. The Supreme Court needed only to decide the scope of the requirement. In contrast, Congress did not incorporate a "knowing" requirement into the text of § 1325. *Rehaif*, 139 S. Ct. at 2194. There is no evidence that Congress intended to apply a scienter requirement to Defendant's status as an alien.

The Supreme Court also found support for its holding because § 924(a)(2) provides for a particularly "harsh" penalty including up to 10 years in prison. *Id.* at 2197. Congress would not have imposed such a harsh penalty without intending the express knowledge requirement to apply to a defendant's status. In contrast, attempted unlawful entry under § 1325(a) is punishable only as a misdemeanor with a maximum prison term of six months. Moreover, the charge already requires the Government to prove Defendant acted with the specific intent to violate the statute and enter or attempt to enter "free from official restraint." (ECF No. 9-1 at 8 (quoting *United States v. Nunez-Soberanis*, No. 18cr4781-MDD, 2019 WL 4141265, at *7 (S.D. Cal. Aug. 30, 2019)).)

The "longstanding presumption" that Congress intends to require a defendant to possess a culpable mental state applies to "each of the statutory elements that criminalize otherwise innocent conduct." *Rehaif*, 139 S. Ct. at 2195 (quoting *X-Citement Video, Inc.*, 513 U.S. at 256–58). As discussed above, Defendant's status does not criminalize

11

otherwise innocent conduct. In light of the Court's finding that *Rehaif* is inapplicable, and because none of the Supreme Court's policy concerns are at issue here, the Court declines to read additional knowledge requirements into § 1325(a) absent evidence of Congressional intent. Defendant presents no additional arguments to persuade the Court that a different result is required. For the reasons stated herein, Defendant's Motion to Dismiss on this basis is **DENIED**.

### IV.     **Equal Protection Based on Unconstitutional Definition of Alien**

Defendant moves the Court to dismiss this case based upon the argument that the statute at issue employs an unconstitutional definition of the word "alien." (ECF No. 9-1 at 14.) Defendant argues that, as a result of the Supreme Court's decision in *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 (2017), Defendant cannot be convicted of a crime where alienage is an element. (*Id.* at 15.) Defendant concedes that this argument has been rejected by the Ninth Circuit in an unpublished decision—*United States v. Madero-Diaz*, 752 F. App'x 537 (9th Cir. 2019)—and Defendant makes the argument to preserve it for further review. (*Id.* at 14–15.)

For the reasons set forth by the Ninth Circuit in the unpublished decisions of *United States v. Duffy*, 752 F. App'x 532, 533–34 (9th Cir. 2019) and *United States v. Madero-Diaz*, and by district judges of this District in *United States v. Mouret-Romero*, No. 18-MJ-22829-WQH, 2019 U.S. Dist. LEXIS 40774, at *4 (S.D. Cal. Mar. 13, 2019) and *United States v. Ramirez-Ortiz*, No. 19-CR-00300-BTM, 2019 U.S. Dist. LEXIS 32390, at *1 (S.D. Cal. Feb. 27, 2019), Defendant's Motion to Dismiss on the basis of the statute being unconstitutional is **DENIED**.

### V.     **"Streamline" Procedures as Violative of Equal Protection, Principles of Selective Enforcement/Prosecution, and Due Process**

**A.     Equal Protection**

Defendant asserts that because his Class B misdemeanor is considered a "petty offense," he should be prosecuted through the Central Violations Bureau ("CVB"). (ECF

No. 9-1 at 15–22.) He argues that this would allow him to have his case dismissed outright or resolved through a fine or deferred prosecution. (*Id.* at 17.)

Defendant further claims that the Government discriminates against 8 U.S.C. § 1325 defendants as compared to other individuals prosecuted for petty offenses in the Southern District of California, as he was treated more harshly than defendants charged with equivalent or more serious crimes. (*Id.*) Furthermore, the defendant contends he was discriminated against because of his alienage and national origin in violation of the Equal Protection Clause of the U.S. Constitution. (*Id.* at 18–19.) Defendant cites to *Graham v. Richardson*, 403 U.S. 365 (1971), in support of his contention that classifications based on alienage, national origin, and race are "inherently suspect and subject to close judicial scrutiny." (*Id.* (quoting *Graham*, 403 U.S. at 371–72).)

In response, the Government asserts that 8 U.S.C. § 1325 does not distinguish based on national origin or race but, even if it did, the Court should still apply "rational basis" review. (ECF No. 10 at 9–10.) The Government relies on *Plyler v. Doe*, 457 U.S. 202 (1981), in which the Supreme Court held that "[u]ndocumented aliens cannot be treated as a suspect class." (*Id.* at 10 (quoting 457 U.S. at 223).) Additionally, *Plyler* instructs "it is 'a routine and normally legitimate part' of the business of the Federal Government to classify on the basis of alien status." (*Id.* (quoting 457 U.S. at 225).)

The Government also cites to a decision from this district, *United States v. Chavez-Diaz*, No. 18-mj-20098-KSC-AJB, ECF No. 29 (S.D. Cal. Oct. 30, 2018). (*Id.* at 11–12.) In that case, the defendant alleged that his prosecution violated equal protection and due process as he was prosecuted under "Operation Streamline" in the District Court, rather than through CVB. Judge Battaglia rejected this argument. Recognizing the dramatic increase in case filings for individuals who illegally entered the United States in violation of 8 U.S.C. § 1325, and the need to hold prompt initial appearances in accordance with Rule 5 of the Federal Rules of Criminal Procedure, Judge Battaglia explained the steps taken by the judges of the Southern District of California to address the substantial increase in case filings. *See Chavez-Diaz*, No. 18-mj-20098-KSC-AJB, at 2–5.

13

The court then addressed the nature of the cases prosecuted in the CVB, noting that they primarily involved violations occurring on federal reservations initiated by citation, which primarily involve infractions, and the defendant's contention that he was treated differently from those defendants and, therefore, targeted because he was a suspect class as an "alien." *Id.* at 5–8. Judge Battaglia distinguished the nature of the criminal charges brought in CVB stating:

> Due to the numbers, and the similarity of the charges, and misdemeanor proceedings under Rule 58, including a plea offer for time served if the plea is tendered early on, the misdemeanor § 1325 cases are handled together. It makes simple organizational sense. The scheduling of these matters in one courtroom or the other is charge based, not nationality based. No separate "court" has been created or exists. Indeed, all § 1325(a) misdemeanor defendants are treated equally, fully receiving all rights and protections they are guaranteed.

*Id.* at 6. Accordingly, the court rejected the defendant's argument, noting that "[i]mmigration violations, like 8 U.S.C. §1325(a), are not subject to disposition as a CVB matter. They do not occur on federal reservations. Defendant's attempts to 'assimilate' illegal entry into the volume of military base trespass cases in unavailing." *Id.* at 8. In sum, "[i]n no way does alienage play a part from the Court's perspective of scheduling the various [8 U.S.C. § 1325] matters [in this Court] brought by the Government." *Id.* at 9.

This Court holds that the prosecution of Defendant in district court did not violate his equal protection rights. As with the defendant in *Chavez-Diaz*, the calendaring of his case with others similarly charged was based on the charges, not the alienage of the defendants. Rather, the Court has the authority to "administer its business with available resources," and processing cases by charge is not discriminatory. *Id.*

**B.     Selective Prosecution and Selective Enforcement**

Defendant argues that, alternatively, the complaint should be dismissed for violation of the Equal Protection Clause due to selective prosecution or selective enforcement. (ECF No. 9-1 at 22.) Defendant acknowledges that courts apply a "rigorous standard" to such claims because of the special province of the Executive Branch and its broad discretion

14

with respect to enforcement of the laws. (*Id.*) Further acknowledging that he must demonstrate both discriminatory effect and discriminatory purpose, Defendant nonetheless argues he can meet this burden due to the differences between CVB court and the traditional criminal proceedings to which § 1325 defendants are subjected (discriminatory effect), and "President Trump's history of disparaging comments about immigrants and people from Mexico and Central America" (discriminatory purpose). (*Id.* at 22–23.)

The Government responds that "[f]or the reasons identified above [with respect to Defendant's first equal protection claim], the procedures the court designed to handle § 1325 cases have no 'discriminatory effect or discriminatory purpose' that would give rise to a selective prosecution claim." (ECF No. 10 at 12 n.4.)

The Court agrees. For the reasons set forth above, Defendant has not established, as he asserts, that "the government is relying on impermissible grounds to prosecute similarly-situated defendants in different systems" (ECF No. 9-1 at 22), and Defendant's motion brought on this basis fails.

**C.     Due Process**

Arguing that the Government violated his substantive and procedural due process rights, Defendant cites to *United States v. Salerno*, 481 U.S. 739 (1987), in support of his assertion that the right to substantive due process "prevents the government from engaging in conduct that shocks the conscience." (ECF No. 9-1 at 24–25 (quoting *Salerno*, 481 U.S. at 746).) Defendant adds that even when the government survives substantive due process scrutiny, it must also survive procedural due process scrutiny as set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976). (*Id.* at 25.) Therein, the Supreme Court identified the following factors for evaluating procedural due process claims: (1) the interest at stake for the individual; (2) the risk of erroneous deprivation of such interest and the probable value of safeguards; and (3) the costs and administrative burden on the Government. (*Id.* (citing *Mathews*, 424 U.S. at 335).)

Defendant argues that the Government violated his substantive due process rights because it deprived him of the benefits of CVB court while extending those benefits to

individuals charged with similar or more serious petty offenses. (*Id.*) He adds that the Court should weigh the *Mathews v. Eldridge* three-factor test in his favor because the interests at stake are substantial, charging him in CVB court would alleviate the risk of erroneous deprivation, and utilizing CVB court for § 1325 defendants would lessen the costs and burden on the Government. (*Id.*)

In response, the Government asserts that Defendant's rights were not violated because he "has received the full panoply of rights afforded [to] criminal defendants under the U.S. Constitution and the Federal Rules of Criminal Procedure." (ECF No. 10 at 13 (citing *United States v. Silva-Sosa*, No. 18-MJ-23270-KSC, 2019 WL 1470868, at *3 (S.D. Cal. Apr. 3, 2019)).) He was presented to a magistrate judge after arrest, he has been appointed counsel, and he has been released on bond. (*Id.*) The Government concludes that "[t]here is a rational basis for the Court's procedures and there is nothing shocking or outrageous about the way 8 U.S.C. § 1325 cases are handled in this District." (*Id.* (quoting *Silva-Sosa*, 2019 WL 1470868, at *3).) Finally, the Government argues that Defendant's procedural due process claim also fails because he "has not identified what process he is entitled to under the Federal Rules that he has not already received." (*Id.*)

For the reasons set forth above, this Court finds that Defendant's due process rights were not violated. There is a rational basis for the Court's procedures and there is nothing shocking or outrageous about the way 8 U.S.C. § 1325 cases are handled in this District. Defendant appeared promptly before a judge in accordance with Rule 5 of the Federal Rules of Criminal Procedure, was appointed counsel, and is proceeding to a speedy trial. The Government satisfied the requirement of providing Defendant with the rights afforded under the U.S. Constitution and the Federal Rules of Criminal Procedure. Aside from arguing that his case should be processed through CVB, something to which the Court has determined he is not legally entitled, Defendant has not identified any other rights to which he is entitled but has not received.

Defendant's Motion to Dismiss on the bases that the streamline procedures violate equal protection, selective prosecution, and due process is **DENIED**.

16

19-mj-10657-JLB-1

## VI. Prosecution of Asylum Seekers as Violative of the Fifth Amendment, the Asylum Statute, and International Treaty Obligations

### A. Fifth Amendment and Asylum Statute

Defendant asserts that he has a Fifth Amendment due process right to seek asylum as well as a statutory right to apply for asylum. (ECF No. 9-1 at 26.) Defendant argues that criminal prosecution for violating 8 U.S.C. § 1325 can "deprive an asylum seeker [of] a meaningful opportunity to be heard because of something as simple as detention during prosecution preventing the petitioner from being able to attend a hearing and support an asylum petition in person," and such prosecutions "improperly deter" would-be applicants from seeking asylum. (*Id.*)

The Government argues that there is no due process bar to prosecuting Defendant and there is no merit to the argument that the prosecution violates Defendant's statutory right to seek asylum. (ECF No. 10 at 13–14.) The Government asserts that both the asylum provisions relied upon by Defendant (8 U.S.C. §§ 1159(a)(1) and 1225(b)(1)(A)(ii)) and the improper entry statute (8 U.S.C. § 1325) are part of the Immigration and Naturalization Act, and Congress could have protected asylum seekers from criminal prosecution if that had been the intent. (*Id.*)

The Court finds Defendant's arguments unpersuasive. A plain reading of the statutes suggests that they are not in conflict and that Congress chose not to grant immunity to asylum seekers who face criminal prosecution under 8 U.S.C. § 1325(a)(2). *See United States v. Ramirez-Ortiz*, 370 F. Supp. 3d 1151, 1155 (S.D. Cal. 2019). Furthermore, like the defendant in *Ramirez-Ortiz*, Defendant here "manufactures hypothetical scenarios instead of showing how he was personally deprived of this purported right to apply for asylum." *Id.*

///
///
///
///

17

## B. International Treaty Obligations

Defendant next argues that his prosecution violates his rights under Article 31(1) of the United Nations Convention Relating to the Status of Refugees ("the Convention"). (ECF No. 9-1 at 27–30.) Although the United States did not sign the Convention, it acceded to the 1967 Protocol Relating to the Status of Refugees (the "Protocol"). *See Khan v. Holder*, 584 F.3d 773, 783 (9th Cir. 2009). "The Protocol bound parties to comply with the substantive provisions of Articles 2 through 34 of the United Nations Convention Relating to the Status of Refugees." *I.N.S. v. Stevic*, 467 U.S. 407, 416 (1984). Article 31(1) provides:

> The Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees, who, coming directly from a territory where their life or freedom was threatened in the sense of Article 1, enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence.

Protocol Relating to the Status of Refugees art. 31(1), Nov. 1, 1968, 19 U.S.T. 6223. However, Defendant's reliance on Article 31(1) of the Protocol to challenge his prosecution is misplaced. *See, e.g.*, *United States v. Velasquez-Luna*, No. 18-mj-11463-WQH, 2019 WL 338947, at *2 (S.D. Cal. Jan. 28, 2019) ("Defendant cannot rely on Article 31(1) of the Protocol to challenge his prosecution."). The Protocol is not self-executing and is therefore not domestically enforceable. *Khan*, 584 F.3d at 783; *see also United States v. Malenge*, 294 F. App'x 642, 644 (2d. Cir. 2008) (holding that an asylum seeker's criminal prosecution for entering the United States using a false passport and identity was not barred by the Protocol because the Protocol "did not provide [defendant] with any judicially enforceable rights"). Because Defendant has no domestically enforceable rights under the Protocol, this argument fails. *See Velasquez-Luna*, 2019 WL 338947, at *2; *United States v. Guevara-Medina*, No. 18-mj-9443-BTM, 2018 WL 3970092, at *1 (S.D. Cal. Aug. 29, 2018); *United States v. Munoz*, No. CR-17-1078 PHX DGC, 2017 WL 4922047, at *3 (D. Ariz. Oct. 30, 2017) (holding that a "[d]efendant acquired no rights

under the 1967 Protocol, including its incorporation of Article 31(1) of the United Nations Convention Relating to the Status of Refugees" and "accordingly cannot rely on these international agreements as a basis for dismissing his indictment").

The Court notes that even if the Protocol were enforceable, Defendant has not set forth facts or otherwise argued that he abided by the Protocol's provisions and presented himself "without delay to the authorities." Under Article 31(1) of the Protocol, "contracting states are free to prosecute when refugees . . . fail to immediately notify authorities that they are seeking asylum and explain their illicit entry." *See United States v. Malenge*, 472 F. Supp. 2d 269, 273 (N.D.N.Y. 2007), *aff'd*, 294 F. App'x 642 (2d Cir. 2008); *Guevara-Medina*, 2018 WL 3970092, at *2 ("Because Defendant hid in the brush after entry in an attempt to evade authorities, and did not intend to apply for asylum unless he was caught, he has not shown that the protections of Article 31(1) of the Protocol apply to him."); *Munoz*, 2017 WL 4922047, at *4 ("Article 31(1) protects asylum seekers who 'present themselves without delay to the authorities and show good cause for their illegal entry or presence.' Defendant did not do this. He did not appear at a U.S. port of entry and ask for asylum.").

Given the foregoing, international treaties do not bar Defendant's prosecution under 8 U.S.C. § 1325(a)(2).

Defendant's Motion to Dismiss based upon claims that his rights as an asylum seeker are violated by his prosecution is **DENIED**.

**IT IS SO ORDERED.**

Dated: October 17, 2019

Hon. Jill L. Burkhardt
United States Magistrate Judge

19

19-mj-10657-JLB-1